FINLAY v. FINLAY BROTHERS & WAYMOUTH TRADING CO.

APELACIÓN procedente de la Corte de Distrito de San Juan.

No. 66.   Resuelto en Mayo 4, 1905.

ARRENDAMIENTO.—SOCIEDAD.—El contrato de arrendamiento es un contrato bilateral consensual, por el que una persona se obliga á dar á otra el uso de una cosa por tiempo determinado ó indeterminado, y precio cierto; contrato que no puede confundirse con el de sociedad, porque en éste dos ó más personas se obligan á poner en común bienes, dinero ó industria, con ánimo de partir entre sí las ganancias.

ID.—PERSONALIDAD DE LA SOCIEDAD.—En toda sociedad constituida por contrato es

indispensable que exista la entidad de la sociedad misma, que es independiente de la de los socios, y necesaria para que la ley le reconozca personalidad, como tal. sociedad.

CONTRATO.—SU INTERPRETACIÓN.—Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas, debiendo interpretarse las unas por las otras, atribuyendo á las dudosas el sentido que resulte del conjunto de todas ellas, y procurando que prevalezca la intención de las partes contratantes.

ID.—CONTRATO DE ARRENDAMIENTO.—TIEMPO DETERMINADO.—Otorgado un contrato de arrendamiento por el término de diez años, y comprometido el arrendatario á satisfacer, durante ese término, un crédito hipotecario constituído sobre la finca arrendada, la circunstancia de haberse estipulado en el contrato que si no se pudiera pagar el referido crédito, durante dicho término, por causas imprevistas, se entendería prorrogado el plazo á lo necesario para pagar la cantidad insoluta, no desvirtua la fijación del término del arriendo, ni es motivo para sostener que su duración sea indeterminada.

ID.—NULIDAD DEL CONTRATO DE ARRENDAMIENTO.—TÉRMINO LEGAL.—La indeterminación del tiempo no es motivo de nulidad de los contratos de arrendamiento, según se deduce de los artículos 1480 y 1484 del Código Civil, que fijan el término legal para la duración de tales contratos, en defecto de pacto en ese sentido.

ID.—PRECIO CIERTO.—*La indeterminación ó condición incierta* del precio, no debe confundirse con la falta de *expresión numérica* del mismo, pués en un contrato *puede existir precio cierto, y no ser susceptible de expresarse numéricamente,* sino mediante determinadas liquidaciones, por estar sujeto á fluctuaciones.

ID.—MANDATARIO.—MANDATO.—INTENCIÓN DEL MANDANTE.—Para apreciar la validez y eficacia de los contratos celebrados por mandatarios, debe acudirse, en primer lugar, á los términos literales del mandato, á fin de determinar los límites de las facultades de aquéllos, siendo lícito é imprescindible invocar la intención evidente del mandante, cuando las palabras de la escritura apareciesen contrarias á ella.

ID.—INSTRUCCIONES PRIVADAS.—TERCERO.—Cuando los mandatarios obren en virtud de instrucciones privadas ó particulares del mandante, los efectos de tales instrucciones son obligatorios entre ambos solamente, sin que puedan afectar á tercero, ni causarle perjuicio alguno.

ID.—CONTRATO CELEBRADO POR EL MANDATARIO.—PODER ILIMITADO.—RATIFICACIÓN DEL MANDANTE.—El convenio celebrado por el mandatario obliga al poderdante, siendo inmaterial determinar en juicio si hubo ó nó extralimitación de facultades, cuando en el poder no se le hayan limitado al mandatario, ó cuando el mandante, teniendo conocimiento del contrato, lo hubiere estimado válido, aprovechándose del mismo en lo favorable.

ID.—DOCUMENTO PÚBLICO.—Otorgada una escritura de arrendamiento á favor de una sociedad, y habiendo comparecido al otorgamiento, en representación de ésta, uno de sus Directores, acreditando su carácter y la facultad de usar la firma social, nada importa para la validez del instrumento, que tal Director firmara con su nombre particular, y no con el colectivo, especialmente si lejos de impugnar la sociedad esa escritura, sostiene, por el contrario, su validez.

ID.—CAUSA.—OBLIGACIONES RECÍPROCAS DE LAS PARTES.—Si por virtud de un contrato de arrendamiento de finca rústica, el arrendador y arrendatario hubieron contraido obligaciones recíprocas, y se hubiere indicado, como uno de los motivos del mismo, el solvendo de las responsabilidades que pesaren sobre dicha finca, y la imposibilidad del arrendador de atenderla personalmente, no puede sostenerse que tal contrato carezca de causa, ó que ésta sea ilícita, torpe ó falsa.

ID.—Cuando de las estipulaciones de un contrato no apareciere cual fuera su causa, se presume que ésta existe, como también se presume que es lícita; mientras no se demuestre lo contrario.

ID.—EFECTOS DE LA ANOTACIÓN DE UNA DEMANDA DE DIVORCIO.—CONTRATOS FRAUDULENTOS.—Anotada en el Registro una demanda de divorcio, sobre los bienes del demandado, todos los actos de éste, relativos á dichos bienes, habrán de subordinarse á las consecuencias del fallo que en dicha demanda se dicte, y en su virtud, no es posible presumir, á los efectos de declararlo fraudulento, que un

contrato de arrendamiento, otorgado por dicho demandado, tenga por objeto eludir. los efectos. de la liquidación de gananciales, ya porque ésto no podría conseguirse por el otorgamiento de un contrato sin causa, ó con causa ilícita, ya porque tal anotación no impide al demandado realizar actos de dominio sobre dichos bienes.

ID.—Para anular los efectos de un contrato consignado en un instrumento público, otorgado con todas las solemnidades y condiciones de la ley, no basta establecer simples conjeturas, insuficientes para llevar al ánimo el convencimiento de su simulación, y justificar la falsedad ó nulidad de la causa que en él se consignara.

ID.—TESTAMENTOS.—Las manifestaciones contenidas en un testamento, como acto unilateral que es, solo pueden perjudicar al testador y á sus herederos, de acuerdo con los principios que regulan la fuerza probatoria de los documentos públicos y en su virtud, no es lícito invocar las manifestaciones consignadas por una parte en su testamento, para. desvirtuar las hechas años después por la misma parte, en un contrato otorgado por escritura pública.

COSTAS.—Las costas deben imponerse á la parte cuyas pretensiones sean totalmente desestimadas.

## EXPOSICIÓN DEL CASO.

En los autos de juicio civil declarativo seguidos en la Corte de Distrito de San Juan sobre nulidad de la escritura de arrendamiento de la hacienda "Carmen", terrenos anexos y negocio de ganado, cancelación de inscripciones y otros pronunciamientos, entre partes dé la una, como demandante Da. Josefina Finlay de Fabián, casada, mayor de edad, propietaria y vecina de esta ciudad, representada y dirigida en esta Corte Suprema por el Letrado Don Eduardo Acuña Aybar, y de la otra como demandada la Sociedad Mercantil de esta Plaza, Sres. Finlay Brothers and Waymouth Trading Company, dirigida y representada por el Letrado Don Jacinto Texidor; autos pendientes ante Nos, á virtud del recurso de apelación interpuesto por la demandante contra la sentencia pronunciada por el referido Tribunal de Distrito, que copiada á la letra dice así:

"Sentencia.—En la ciudad de San Juan de Puerto Rico á dos de Junio de 1904; visto en juicio oral y público los presentes autos declarativos sobre nulidad de escritura de arrendamiento, cancelación de inscripciones y otros pronunciamientos, seguidos entre partes: de una como demandante, Da. Josefina Finlay de Fabián, casada, mayor de edad, propietaria y vecina de esta ciudad, representada y dirigida por el Letrado Don Eduardo Acuña Aybar; y

de la otra como demandada, la Mercantil de esta Plaza Finlay Brothers and Waymouth Company y en su nombre el Licenciado Don Jacinto Texidor:

1.—Resultando: que acompañando certificado de la conciliación sin avenencia Da. Josefina Finlay de Fabián formuló demanda contra Finlay Brothers and Waymouth Trading Co.. pidiendo se declare nula la escritura de arrendamiento de veinte y cuatro de Octubre de mil novecientos dos de la hacienda Carmen, terrenos anexos y negocio de ganado entre Don Jorge I. Finlay y dicha sociedad. cancelándose en el Registro de la Propedad las inscripciones que en el cuerpo del escrito expresa, ó declarar limitada la nulidad y sus efectos al condominio de la demandante con las costas á la demandada.

2.—Resultando: que sentó como hechos: la escritura otorgada ante el Notario Don Mauricio Guerra, en la fecha antes indicada, por Don Juan F. Finlay en representación de su hermano Don Jorge, y Don Rafael Ojeda en la de la sociedad demandada, exponiendo que el motivo del contrato era el estado de salud de Don Jorge y la necesidad sentida de la más esquisita vigilancia para la administración de la finca por las grandes responsabilidades que sobre ella pesaban, razón por la que determinaba darla en arrendamiento por el tiempo y condiciones que se expresaran, dando instrucciones á Don Juan para verificarlo; en la escritura se hace constar la finca objeto del contrato y el acuerdo de practicar un inventario de las existencias y plantaciones á los efectos de la devolución en su día; que el pago á Charles P. Armstrong y otros era uno de los motivos del contrato, expresándose que el arrendatario debía satisfacer el capital é intereses ascendentes en totalidad á doscientos catorce mil ciento diez pesos, siendo el primer plazo en doce de Marzo de mil novecientos tres, y el último en dos de Septiembre de mil novecientos once; el precio de arriendo lo constituiría el pago anual de los plazos y sus intereses relacionados y además á Don Jorge Finlay ó á sus herederos, durante el contrato en calidad de precio del arrendamiento, veinticinco centavos por cada quintal de azúcar de segunda que se elaborase y diez centavos por cada quintal de la miel y además el cincuenta por ciento de la utilidad que rindiera el alambique. siendo el precio del arrendamiento lo expresado; que en el arrendamiento se comprendió el negocio de ganado que tenía en la hacienda Don Jorge, conviniendo se pagaría á la sociedad arrendataria como precio de ese arriendo la mitad líquida de utilidades en cada año, llevándose la contabilidad que la cláusula determina; siendo por diez

años el arrendamiento, necesarios para el pago del crédito mencionado, y no logrando hacerlo dentro de ese término por causas que no podían en el momento determinarse pero que podrían presentarse sin culpa del arrendatario, se prorrogaría el plazo á lo necesario si el acreedor se prestase á una prórroga fijando el plazo para el pago de la cantidad insoluta lo que se verificaría de acuerdo entre el acreedor y la sociedad arrendataria y conviniendo á ésta continuar el contrato por el tiempo necesario por el acreedor concedido, cuya prórroga sería bajo las demás condiciones de la escritura; y si ocurriese caso fortuito para las fincas arrendadas que impidiese su explotación como ahora se efectúa sin gastos extraordinarios, podría pedir la sociedad arrendataria la rescisión del contrato; Don Juan Finlay representó á su hermano Don Jorge con poder de tres de Junio de mil ochocientos ochenta y siete con cláusula suficiente para poder arrendar, pero no se inserta el contenido del poder en la parte que otorga la representación y dice (con arreglo á las instrucciones que por separado comunicaría el poderdante), acreditándose la representación de Don Rafael Ojeda en vista de la constitución de la Sociedad otorgada en veinte y tres de Mayo de mil novecientos uno de la que formaban parte y eran directores con la firma social Don Jorge y Don Juan Finlay, Don Tomás Jorge Waymouth, Don Alberto Lee y el otorgante, usando Ojeda su firma personal al otorgar escritura de arriendo; que este arriendo se inscribió en el Registro de la Propiedad, y por no haber concurrido la esposa de Don Jorge al otorgamiento de la escritura como era legal en su fecha estuvo detenida la inscripción hasta que la Asamblea Legislativa dió eficacia á los contratos otorgados sin el requisito de la asistencia del cónyuge; que en veinticinco de Marzo de mil novecientos dos presentó Da. Emilia F. Francisca Van Ryn demanda de divorcio contra Don Jorge Finlay, comprendiendo la demanda la liquidación de los bienes de la sociedad conyugal, solicitando medidas para evitar se tratara de perjuicar en sus intereses, por lo cual pedía se anotara la demanda en el Registro de la Propiedad, y se llevó á efecto la anotación en la hacienda "Carmen" y sus anexos, cancelándose por transacción en veinte y nueve de Enero de mil novecientos tres por la que Da. Emilia y sus hijas herederas de Don Jorge Finlay, ya fallecido, transigieron con relación á los bienes gananciales y derechos de aquella á la herencia; que enfermo Don Jorge de alguna gravedad, en Julio de mil novecientos dos salió para Nueva York el quince, regresando á mediados de Agosto, volviendo á Nueva York el 10 de Septiembre, yendo á Europa, regre-

sando á Nueva York, llegando á San Juan el veintiocho de Noviembre, falleciéndo el veinte y seis de Diciembre del mismo año; que por su testamento instituyó herederas á sus hijas de las que sólo existían tres, dejándoles la Hacienda Carmen con todo su contenido, expresando que esta hacienda fuese administrada al mejor rendimiento posible para que lo adeudado á su defunción fuera pagado con puntualidad, quedase libre la finca de deudas cuanto antes, autorizando se entregase á cada una de sus hijas, para sus gastos, una cantidad que no excedería de trescientos dollars mensuales; que la hacienda no debería venderse ni las partes de herencia hasta pagar todas las deudas, declarando además que la hacienda "Carmen" debía ser trabajada para el absoluto beneficio de sus hijas y herederos y sólo las ganancias podrían ser usadas por ellos, prohibiendo toda hipoteca nueva ú obligaciones que se contrajesen á cuenta de la hacienda, siendo Don Juan Finlay el primer albacea fideicomisario; que en dos de Abril de mil novecientos tres se efectuó la partición de bienes de Don Jorge Finlay entre Da. Emilia, Da. Micaela y Da. Josefina Finlay, haciéndose constar en las hijuelas, correspondía á cada una ciento treinta y dos mil setecientos cincuenta pesos veinte centavos, agregándose en el haber para pago de la tercera parte de la hipoteca de la "Carmen" y "Monserrate" á favor de Armstrong, cincuenta y cuatro mil novecientos pesos, adjudicándose entre diversos bienes á cada uno la tercera parte de la "Carmen", de la "Monserrate" y demás terrenos proindiviso perteneciendo por ello en condominio por iguales partes á las tres hijas herederas, siendo esa finca la misma que fué objeto del contrato de arrendamiento relacionado: haciendo Da. Josefina constar en la partición que su conformidad era sin perjuicio de sus derechos contra el arrendamiento de la "Carmen" y no acepta la manifestación que en ese contrato hace el apoderado de su padre de que fuera hecho con arreglo á sus instrucciones que hubiera dado para efectuarlo en los términos que aparece; que no ha conseguido amistosamente se anule el contrato y pudiendo dar la hacienda "Carmen" y sus anexos con quinientas cuerdas de plantillas y mil cien de tocones, ochocientos cuarenta mil quintales de cañas ó sean seiscientos trenta mil quintales de azúcar de segunda y ocho mil cuatrocientos de tercera, con un valor de tres pesos treinta centavos la primera y dos pesos cincuenta la segunda, daría un producto brúto de doscientos veinte y ocho mil novecientos pesos, deducidos ciento cuarenta y cuatro mil cuatrocientos de gastos, queda un líquido de ochenta y cuatro mil quinientos pescs; y tcmando por ejemplo el año de mil

novecientos cuatro, el arrendamiento pagaría por el crédito doscientos ochenta mil pesos ochenta y cuatro centavos, por el tanto por quintal á los condueños ciento sesenta y seis mil treinta pesos dejando un líquido á la sociedad arrendataria de cuarenta mil setecientos ochenta y seis pesos y el último año de arriendo ó sea del dos de Septiembre de mil novecientos once á veinte y cuatro de Octubre de mil novecientos doce estaría extinguido el crédito hipotecario, terminaría el arriendo con un beneficio de setenta mil pesos próximamente para el arrendatario.

3.—Resultando: que el derecho alegado es: que los contratos de las sociedades mercantiles para ser válidos deben ser suscritos con la firma social; que no existe causa en el contrato, indeterminado el precio y tiempo del contrato; que Don Jorge no pudo dar instrucciones para un contrato que limita su dominio un número indefinido de años, y dadas, no sería válido por no tener capacidad para otorgarlo en persona por la anotación de la demanda; los artículos 405, 1446, 1569 y 1621 del Código Civil, y la temeridad para la imposición de las costas.

4.—Resultando: que contestada la demanda por Finlay Brothers and Waymouth Trading Company pide se declare sin lugar, válidos y eficaces el contrato y escritura de arrendamiento y sin lugar la nulidad parcial y cancelación de inscripciones, con las costas al demandante.

5.—Resultando: que para ello se funda: en la escritura de arriendo en la que comparecieron Don Jorge Finlay representado por su hermano Don Juan y la sociedad demandada por una de sus Directores, Don Rafael Ojeda, el primer compareciente lo hace por virtud del poder que le confiriera Don Jorge en tres de Junio de mil ochocientos ochenta y siete con facultades, entre otras, para vender y arrendar sus bienes, no siéndolo el motivo de la escritura la enfermedad de Don Jorge sino evitar que cayendo la finca en manos poco hábiles puedan retrasarse los pagos de la deuda hipotecaria y desea evitar que esto suceda y no produciendo la anotación de la demanda de divorcio el efecto de obstaculizar el ejercicio de los derechos que como dueño tenía Finlay, el contrato es legal en cuanto á la capacidad que éste tenía para otorgarlo; que en el contrato se comprendió el negocio de ganado bajo condición de hacerse inventario del número para en su día devolver el mismo número, clase y condición de las arrendadas, fijándose diez años término especificado y concreto, y se fija porque se calcula quedará satisfecha la deuda hipotecaria y como esta deuda es el más importante motivo

del contrato y las cantidades que á ellas se abonen forman parte la más. esencial del precio del arrendamiento, se fija el término en que se entiende quedará solventada la deuda, y si antes queda satisfecha, el contrato ha terminado, dándolo por terminado la cláusula catorce y preveyendo el caso de que se presente dificultad de satisfacer los plazos del crédito hipotecario establece el remedio, la prórroga evidenciando que el más importante fin del contrato es el pago del crédito, no quedando con esa prórroga al arbitrio de los contratantes, fijar nuevo término ó quedar sometido al tiempo preciso para poder pagar el crédito; afirma la existencia del precio cierto, que es el pago de los plazos del crédito hipotecario y el tanto por ciento que refiere la demanda para los condueños que podrá ser mayor ó menor; que la representación de Don Juan Finlay se halla acreditada por la inserción de la cláusula primera de la escritura de poder por la facultad que tiene para vender, arrendar ó hipotecar los bienes de su poderdante, no siendo preciso acreditar las instrucciones, estando acreditada la representación de Don Rafael Ojeda por comparecer á nombre de Finlay Brothers and Waymouth Trading Company la que ha puesto en ejecución el contrato; siendo cierto se llevó al Registro de la Propiedad la escritura de arriendo y se puso la nota que se menciona y dice: "por no haber comparecido la esposa de Don Jorge Finlay al otorgamiento de la escritura de arrendamiento como era legal &", pero la Asamblea Legislativa ha dado fuerza y vigor á ese contrato, entre otros, y ya no tiene tal efecto y si existiera, no es la demandante y sí Da. Emilia Van Rhyn quien podría hacerlo, y sienta que el arrendamiento de que se trata fué otorgado con arreglo á la legislación en vigor en la fecha en que se otorgó, el antiguo Código Civil, y ese contrato de veinte y cuatro de Octubre de mil novecientos dos fué inscrito en el Registro de la Propiedad según al pié de la copia; que al otorgarse la escritura de arrendamiento, Don Juan Finlay se ciñó á las instrucciones que para ello le había comunicado su hermano y poderdante Don Jorge en las distintas conferencias que para ese fin habían tenido con él, encontrándose Don Jorge en Nueva York se le comunicó, aprobando en absoluto lo hecho por su apoderado é hizo conocerlo á éste y á otras personas; es cierto que Da. Emilia Van Rhyn estableció demanda de divorcio contra Don Jorge y la anotación de la demanda se canceló en el Registro; dicha Sra. en veinte y nueve de Enero de mil novecientos tres otorgó escritura dando por terminado el pleito de divorcio y los incidentes y por ella cede á Da. Josefina, Doña Emilia y Da. Inés Finlay cuantos

derechos puedan corresponderle por su aportación al matrimonio con Don Jorge y por utilidades ó gananciales, percibiendo la cedente diez mil dollars á más de la propiedad de varias fincas y una pensión vitalicia; que el testamento de Finlay revela el deseo constante de que la Hacienda "Carmen" no vaya á perderse en manos inhábiles y su crédito y nombre estuviese á la altura que siempre estuvo, y dispone su testamento que cuando todas las deudas de su propiedad hayan sido pagadas, entonces, y nunca antes, podrá el total de las ganancias de la hacienda ser dividido entre sus antes mencionadas hijas y sus legítimos hijos y por eso ideó una forma de arrendamiento y cortar la demanda contra los actos de Finlay y contra el testamento; consigna que la finca se trabaja para el absoluto beneficio de sus hijas y herederos y prohibe se establezca ninguna nueva hipoteca ú obligación sobre ella, prohibición que va encaminada á sus herederos no puede referirse más que á hipotecas ú obligaciones después de la muerte de Don Jorge Finlay; y respecto á que la finca ha de ser trabajada para el absoluto beneficio de las hijas y sus herederos, el testador desea que su finca se administre lo mejor posible, estatuye y fija la forma en que ha de emplearse el producto de su hacienda lo que ha de pasarse como renta á sus hijas, etc.; es decir, que los albaceas hubieran podido administrar la finca para pagar las deudas, pasar las rentas á las herederas, refaccionar y mejorar la finca y administrando la finca mucho antes del arrendamiento la sociedad demandada, el contrato que concibió Finlay, cuidadosamente estudiado, resueltos ya por él todos sus detalles, de sus instrucciones á su hermano y apoderado, se otorga la escritura y ratificado expresamente el contrato por él, se respeta hoy por dos de sus herederas, y no puede ser tachado de gravoso y oneroso por una sola por tratarse de una finca gravada, que intereses y capital ascienden á doscientos catorce mil ciento diez dollars que hay que pagar doscientos treinta y siete mil noventa pesos, promedio por año y debe satisfacerlos la sociedad arrendataria, por lo que estando en administración de los herederos tendrían éstos que efectuarlo y para producir la finca es preciso afrontar los fondos del cultivo y molienda, nuevo gasto anual que es de ciento cincuenta mil pesos, suma de que no podrían disponer las herederas, tendrían que levantar fondos con grandes sacrificios ó creando una nueva obligación, prohibida por el testador; hoy según el contrato la sociedad arrendataria acepta las vicisitudes del mercado, las eventualidades del negocio, asegura el pago del crédito hipotecario, entrega la renta mensual y en su día devuelve la finca libre de cargas, mientras en la adminis-

tración por los herederos renacería el desacuerdo, como lo hay en lo
que á este contrato se refiere, y ese desacuerdo sería la ruina de la
finca ó su entrega á los acreedores hipotecarios para su pago; que
es cierto ser tres las herederas y en esencia la división y adjudica-
ción de bienes que se indica, cierta la manifestación del hecho noveno
de la demanda, pero en esa escritura de partición no se habla del
arrendamiento de la Hacienda ''Carmen'' más que en esa manifesta-
ción niega haya hecho la demandante proposición alguna para que
la siciedad arrendataria acepte la administración de la finca por el
tiempo necesario para librar la hacienda de la deuda que sobre ella
pesa; niega las cuentas galanas, así dice, de ganancias supuestas,
productos, etc., y que afirma la demandante establece el promedio de lo
que debe abonarse á Armstrong, sienta el producto de mil novecientos
dos, el precio medio del azúcar, los gastos que se deben deducir fijando
el beneficio del azúcar en cuarenta mil cuatrocientos cuarenta y
dos pesos ochenta y dos centavos, que agregados á los demás beneficios
que detalla da un total de beneficio de cincuenta y dos mil seiscientos
noventa y ocho pesos ochenta y dos centavos hechas las deducciones
que indica, queda de beneficio al arrendatario alrededor de trece mil
setecientos pesos, según las cuentas de gastos é ingresos, siendo erró-
neo y falso el principio y falsas las consecuencias que al tratar ese
punto sienta la demandante, por tener en cuenta que la caña á los
medianeros se compra; describe el cosecho de mil novecientos tres,
sosteniendo que el producto en quintales de cañas asciende la produ-
cida por la hacienda á trescientos sesenta y tres mil quinientos
treinta y tres quintales treinta y cinco libras de cañas y doscientos
ochenta y ocho mil ochocientos cuarenta y seis quintales cuarenta y
cinco libras de las compradas á medianeros, total seiscientos cin-
cuenta y dos mil trescientos setenta y nueve quintales ochenta libras
de caña, diferencia enorme entre el producto por la contraria sentado
y los datos exactos de la administración, siendo el producto en azú-
car cincuenta y siete mil seiscientos veinte y siete quintales cincuenta
libras de segunda y seis mil doscientos cuarenta y cinco quintales
veinte libras de tercera, lo que es fijo y seguro, siendo inexacto el
cálculo de la demandante; niega la afirmación de que fuera depen-
diente Don Rafael Ojeda, siendo gestor desde el cinco de Mayo de
mil ochocientos noventa y cuatro de sucesores de Finlay Brothers
y al constituirse la sociedad demandada en veinte y tres de Mayo
de mil novecientos uno se hizo accionista Ojeda, de la que es uno
de los Directores; niega los demás hechos de la demanda en cuanto
la perjudican; siendo el derecho: que hay tiempo determinado pre-

cio cierto en el contrato, el que tiene los requisitos esenciales para su validez, agregando los artículos cincuenta, cincuenta y uno, ciento diez y ocho, ciento treinta y cuatro y ciento cincuenta y cinco del Código de Comercio, los mil doscientos veinte y uno, á mil doscientos veinte y cinco, mil doscientos cuarenta y cinco, mil doscientos cuarenta y seis, mil doscientos cuarenta y ocho, á mil doscientos cincuenta, mil doscientos cincuenta y dos, mil doscientos sesenta y siete, mil doscientos setenta y seis, mil doscientos setenta y ocho, mil cuatrocientos cuarenta y seis, mil quinientos sesenta y siete, y mil seiscientos veinte y siete del Código Civil, las sentencias del Supremo de primero de Diciembre de mil ochocientos ochenta y seis, once de Mayo de mil ochocientos ochenta y ocho, cuatro de Julio de mil ochocientos noventa, y trece de Noviembre de mil ochocientos noventa y cinco, la Ley de la Asamblea Legislativa de veinte y cuatro de Febrero de mil novecientos tres y el artículo sesenta y tres de la Orden General ciento diez y ocho de mil ochocientos noventa y nueve.

6.—Resultando: que de las pruebas del actor consta la escritura de partición de bienes de Don Jorge Finlay otorgada por sus herederos, presentada por el demandante, en la que consta que falleció Don Jorge en veinte y cuatro de Diciembre de mil novecientos dos, el testimonio librado por el Notario Don Gabriel Guerra del testamento de Don Jorge Finlay bajo pliego cerrado del otorgado en once de Abril de mil ochocientos noventa y seis, auto de esta corte que lo declara testamento y de acta de su protocolización de diez y nueve de Eenero de mil novecientos tres pidiendo viniesen á los autos por medio de los oportunos mandamientos testimonio de la escritura de arrendamiento de la Hacienda "Carmen" el poder otorgado por Don Jorge Finlay á su hermano Don Juan, testimonio del acta de protocolización del inventario general de la hacienda "Carmen", que en diez de Noviembre de mil novecientos dos extendió el Notario Guerra y del particular de dicho inventario que se comprende bajo el rubro de "cañas para moler en la hacienda "Carmen" en la zafra de mil novecientos dos á mil novecientos tres", particulares que según escrito de catorce de Septiembre de mil novecientos tres el defensor de la actora, para evitar duplicidad cree innecesaria la práctica de esa prueba por haber sido presentada por la contraria, reservándose el derecho de gestionar su aportación si fueren retirados reconociendo esos documentos presentados no siendo por tanto preciso el cotejo y se mencionaran en el Resultando de prueba de los demandados.

7o.—Resultando: de la prueba de la actora además de la certificación librada por el Registrador de la Propiedad de San Juan de constar en el Diario el asiento número trescientos cincuenta y cuatro de presentación de la escritura de arrendamiento objeto del pleito en primero de Diciembre de mil novecientos dos, y al margen la nota de retirarse el documento presentado por desistir por ahora de la inscripción llevando la nota fecha de siete de Enero de mil novecientos tres, constando el asiento número seiscientos cinco de presentación de la expresada escritura de arriendo en nueve de Febrero de mil novecientos tres y al margen del desistimiento en cinco de Marzo y otra nota hecha la inscripción de documento del asiento adjunto en cuanto á las fincas relacionadas en el mismo, excepto la á que se refiere la anterior nota, de cuya inscripción se ha desistido'' de fecha de seis de Marzo de mil novecientos sigue el asiento de inscripción del arrendamiento de la Hacienda Carmen á la sociedad demandada en estos autos en seis de Marzo de mil novecientos tres y al margen uno nota que dice: las otras fincas que se inscriben de las comprendidas en el documento objeto de la inscripción del frente se han inscrito donde indica la nota marginal del asiento'', sigue la copia literal de la estancia ''Monserrate'' del arrendamiento requerido su fecha de seis de Marzo del año mencionado, siguiendo la del terreno, en el barrio de ''Candelaria'' de Vega-alta, otra del terreno situado en el barrio de ''Candelaria'' de Vega-alta, la del terreno en el barrio ''Cabo Caribe'' de Vega Baja y otro terreno en el citado barrio ''Candelaria'' de Vega-alta, siendo todos esos asientos del arrendamiento referido; certificación expedida por el Secretario de este Tribunal de la demanda de divorcio formulada por Da. Emilia Van Rhyn contra su esposo Don Jorge Finlay, provisto admitiéndola, ordenando se tramite, y accediendo á la anotación de la demanda, copia del mandamiento del Sr. Registrador de la Propiedad y de la anotación hecha por el Registrador á virtud de ese mandamiento.

8.—Resultando: que además acompañó dos certificados autorizados por los representantes de la Compañía ''Red D. Line'' y ''The New York and Porto Rico Steamship Company'' referentes á que Don Jorge Finlay embarcó y desembarcó en los buques de dichas compañías los días, meses y años que expresan á los que prestó su conformidad la parte contraria, declarando dos directores de la sociedad demandada, expresando uno que Don Francisco de P. Acuña envió varias cartas cuyo contenido no recuerda á nombre de Da. Josefina Finlay pues se entendieron con Mr. Waymouth, sabe hicieron

indicaciones sobre rescisión del arrendamiento con la sociedad y esta continuará administrando la "Carmen" con una comisión, pero no puede precisar el arreglo propuesto; que mandó á hacer el inventario que obra en autos y se le pone de manifiesto que se hizo en la hacienda y no intervino personalmente en su formación; él otro Director dice que Da. Josefina Finlay por conducto del Sr. Acuña no ha hecho proposición de arreglo alguna y sí solo de arreglo de cuentas y no á la casa sino á los albaceas, no habiendo celebrado conferencias sobre rescisión del arrendamiento como socio de los demandados, pero sí la celebró como esposo de una de las herederas, proponiendo como tal comprar las acciones de Da. Josefina, cuyas conferencias tuvieron lugar hace cuatro meses, que en Marzo de mil novecientos tres hubo conferencias con el Señor Acuña pero éste no hizo la proposición de quedar en administración la Hacienda Carmen hasta pagar la deuda de Armstrong, que estas proposiciones las hizo el absolvente al Sr. Fabián antes de marcharse á Europa y no fueron aceptadas por éste; que sobre el arrendamiento no recuerda hiciera manifestaciones pues sobre este punto no se ha hablado mucho; no sabe el beneficio que obtuvo Don Jorge Finlay en mil novecientos uno en la Carmen, sabe que fué más que normal por haber llegado los azúcares á los Estados Unidos después de levantados los derechos de importación, y esto es posible se lo haya dicho á Da. Josefina; que el inventario de la Carmen y sus anexos lo hizo el mayordomo de la hacienda con peritos para tasar el ganado, maquinaria, etc., lo que sirvió luego para hacer el inventario; que entre el inventario obrante en autos y la realidad de la caña sembrada existía una diferencia de ciento noventa cuerdas incluídas indebidamente en el inventario, siendo así que eran de dos medianeros las cañas constando por cartas del administrador posteriores al inventario; las de plantillas eran muy pocas, unas doscientas ó doscientas cincuenta cuerdas, el resto era caña vieja al inventariar; que el ganado no sabe el peso que tuviera sólo se hizo constar el número de cabezas y el precio; puéstale de manifiesto la carta del siete de Noviembre dirigida al declarante por Don Jorge Finlay la reconoce como auténtica y hace referencia á otra donde se daba cuenta del arrendamiento de la Carmen como se había consumado.

9.—Resultando: que declaró el testigo Don Francisco de P. Acuña que como apoderado del demandante celebró en Marzo de mil novecientos tres varias conferencias con los demandados para evitar este pleito, quedara sin efecto el arrendamiento y la finca en

administración cobrando una comisión, repartiéndose las utilidades los herederos, lo que no se aceptó por los demandados, celebrando conferencias con Finlay y Waymouth como socios y no como herederos y después de iniciado el pleito se hicieron nuevas proposiciones al abogado de los demandados, contestando el defensor de éstos que hay otros directores además de los referidos pero cada director tiene facultades para concertar un arreglo, que la finca tiene unos doscientos mil pesos de hipoteca á Armstrong y que esta casa aceptó una cláusula por la que los demandados se hacían solidarios de la hipoteca.

10.—Resultando: que los peritos declararon que el cálculo de producción de una hacienda y terrenos anexos con quinientas cuerdas de cañas de plantillas y mil ciento diez de tocones, es posible pueda dar ochocientos cuarenta mil quintales de azúcar de segunda y ocho mil cuatrocientos de tercera, asignando un valor de tres pesos treinta centavos por quintal de la primera y de dos pesos cincuenta la segunda, daría un producto bruto de veinte y dos mil ochocientos pesos y deduciendo catorce mil cuatrocientos pesos por todo gastos, incluso las contribuciones, puede fijarse el líquido de la finca en ochenta y cuatro mil quinientos pesos; pero mil setecientas sesenta y seis cuerdas de cañas han debido producir novecientos treinta y cinco mil doscientos cuarenta y seis quintales cuarenta y cinco libras de cañas calculando las de retoño á cuatrocientos quintales por cuerda y las de plantillas á ochocientos quintales y las cuatrocientas de aparceros con el mismo producto que constan en la cuenta al folio ciento cincuenta y ocho vuelto; y á las preguntas del demandado contestan no es posible fijar de antemano cual es el rendimiento de una finca de caña como la Hacienda Carmen en cada año y durante un período de diez años; que si se proporcionan datos es posible fijar el número de cuerdas de cañas de plantillas y de tocón durante cada año un período de diez años; que es cierto que la hacienda Carmen y en las demás haciendas no se muele todos los años el número exacto de cuerdas de cañas sembradas que esto depende de la conveniencia del dueño y clase de plantación de la finca; y á la pregunta como es cierto que el rendimiento de azúcar es valible dependiendo del cultivo, abono, tiempo y otras condiciones, y no solamente del número de quintales de caña sino de la clase y condiciones de ésta, contestó uno de los peritos; puede corresponder; otro que no puede contestar pues desconoce la hacienda Carmen y el otro que á su juicio no corresponde porque las de la hacienda rinden trescientos noventa quin-

tales por cuerdas y las de los colonos setecientos veinte y dos; once quintales por cuerdas, que sus cálculos los ha hecho basado en las doscientas cincuenta cuerdas de plantilla de la Carmen y en las mil ciento diez y seis de retoño junto.

11.—Resultando: de la prueba de los demandados, la escritura de arrendamiento objeto del pleito, otorgada en veinte y cuatro de Octubre de mil novecientos dos é inscrita en el Registro de la Propiedad en seis de Marzo de mil novecientos tres, la primera copia del acta Notarial de protocolización del inventario y la copia de dicho inventario general de la Hacienda Carmen, en diez de Noviembre de mil novecientos dos, firmado por Don Juan Finlay y por Don Rafael Ojeda, éste como uno de los directores de la sociedad demandada, expresándose en ella que en el contrato de arrendamiento se acordó formalizar el inventario y habiéndolo extendido acuerdan protocolizarlo entregándolo y el Notario lo agrega rubricando á continuación del acta viniendo dicho inventario que aparece autorizado por los antes expresados Finlay y Ojeda; en la primera copia del poder otorgado por Don Jorge I. Finlay á su hermano Don Juan F. Finlay el tres de Junio de mil ochocientos ochenta y siete, en cuya copia consta lo confiere para que en su nombre y representación y con arreglo á las instrucciones que por separado le comunique, lo ejerza en la forma que las cláusulas expresan y son, vender, arrendar, ó hipotecar sus bienes muebles é inmuebles otorgando y aceptando las respectivas escrituras del caso; siendo este documento y los dos anteriores del Resultando también prueba de la demandante, según así se hizo constar en el Resultando á ella referente.

12.—Resultando: que es igualmente prueba de los demandados que la primera de la escritura de transacción y cesión de acciones y derechos otorgados en veinte y nueve de Enero de mil novecientos tres por Da. Emilia Van Rhyn á favor de las herederas de Don Jorge I. Finlay, Da. Emilia, Da. Inés y Da. Josefina, de cuantas acciones y derechos les corresponden y puedan corresponderles tanto por razón del capital aportado al matrimonio como por las ganancias obtenidas por la sociedad conyugal, dando por terminado el pleito de divorcio y los incidentes, obligándose á desistir de ellos: copia de la escritura de la sociedad (sucesores de Finlay Brothers) otorgada en 7 de Mayo de 1894 por Don Jorge y Don Juan Finlay y Don Rafael Ojeda, con un capital de treinta mil pesos aportado por los dos primeros, que son comanditarios, siendo gestor administrador con el uso de la firma social Don Rafael Ojeda; copia de la escritura de disolución de esa sociedad en veinte y ocho de Mayo

de mil novecientos uno haciéndose cargo de la liquidación la nueva casa creada "Finlay Brother Waymouth Trading Company."

13.—Resultando: igualmente prueba de los demandados los documentos privados: una planilla referente á la hacienda "Carmen" suscrita por el Mayordomo Don Manuel García Marrero correspondiente á la semana de treinta y uno de Mayo á seis de Junio de mil novecientos tres; otra de la de diez y nueve de Julio á veinte y cinco de ese mes y año, y una cuenta general de cañas de la referida hacienda, zafra de mil novecientos tres firmada en nueve de Junio por el dicho Mayordomo; una carta de siete de Noviembre de mil novecientos dos fechada en Nueva York escrita en Inglés, firmada Geo. I. Finlay, dirigida al Sr. Waymouth; otra de siete de Noviembre de mil novecientos dos escrita en Nueva York por Don Jorge I. Finlay recibida por Don Hilario Cuevillas; otra de Nueva York suscrita por Charles P. Armstrong, Roland D. Armstrong y William F. Armstrong en 12 de Noviembre de mil novecientos dos dirigidas á Finlay Brothers & Walmouth Trading Company, reconocidas por aquellos que la autorizan siendo cierto el contenido de la carta, las firmas suyas y de su puño y letra, que tiene una Hipoteca en la Hacienda Carmen, pagadera en diez años y que el primer plazo se pagó en Septiembre de mil novecientos tres, constando esas declaraciones en el exhorto librado á Nueva York.

14.—Resultando: asimismo fué prueba de los demandados la exhibición del libro Mayor número cuatro de Don Jorge I. Finlay para testimoniar la cuenta "zafra de mil novecientos dos" y exhibido se copió y sumados los detalles arroja ciento sesenta y tres mil ciento seis pesos cuarenta y nueve centavos, siguiendo la partida á ganancias y pérdidas beneficio que arroja la zafra, cincuenta y dos mil seiscientos noventa y ocho pesos ochenta y dos centavos que sumadas dan doscientos quince mil ochocientos quince pesos treinta y un centavos apareciendo á folios doscientos cuarenta y cuatro de ese libro por ventas de azúcar al promedio de 308, y ciento ochenta y cuatro mil quinientos cuarenta y un pesos diez y nueve centavos; por ventas de ron cinco mil novecientos veinte y seis galones, diez y siete mil seiscientos tres, cuarenta y tres; por mieles tres mil novecientos setenta y ocho pesos y cincuenta centavos; por beneficios de bueyadas, tres mil novecientos cincuenta y cuatro pesos veinte centavos; por el de ganado de crianza, mil ochocientos sesenta y tres cincuenta; por el caballar, ciento ochenta y cinco pesos; por el de carretería, tres mil ochocientos noventa y tres pesos veinte y cuatro centavos... Total doscientos quince mil cuatro-

cientos setenta y nueve pesos, seis centavos, que con trescientos veinte y seis pesos veinte y cinco centavos de (balance) y por (balance) aparecen conformes las cuentas.

15.—Resultando: que ausente en Barcelona el testigo de los demandados Don Hilario Cuevillas declaró, por exhorto, tuvo estrecha amistad con Don Jorge Finlay de quien era abogado; que Don Jorge Finlay deseando marcharse para Europa buscaba un medio de desprenderse de sus negocios y para ello gestionaba también dejar entre otras manos la Hacienda "Carmen", que al efecto ideó la formación de una sociedad en la que quedaría como accionista y también otros medios, no pudiendo conseguir el referido; que el importante compromiso de la Hacienda Carmen es la deuda hipotecaria á favor de Armstrong y por veinte y un mil cuatrocientos dollars; que sin poderlo asegurar entiende trató de arrendar la Carmen á la Sociedad demandada por los hechos que ocurrieron después de otorgada la escritura de arrendamiento respecto al negocio de ganado me parece natural puesto que ese negocio iba unido al de la hacienda; tuvo conocimiento de haberse otorgado la escritura de arrendamiento pues intervino en la redacción de la minuta; que es cierto le escribió á Don Jorge Finlay que la copia que se le lee la recibió sin poder afirmar esté completa de acuerdo pero recuerda le daba gracias por la participación en redactar la escritura, lo que le hizo comprender conocía Finlay todos los términos de ésta, demostrando estar contento por el otorgamiento del arriendo quedando tranquilo por sus intereses; y preguntado declara: fué abogado de Don Jorge en el divorcio promovido por su esposa, cuyo juicio fué objeto de transacción, pareciéndole cierto se anotó la demanda; fué consultado por Saldaña y Waymouth para la escritura de arrendamiento; que intervino como abogado en el arreglo de la testamentaría, y que al ausentarse el declarante era pública la interposición de la demanda y conoció ésta por manifestaciones de varios, del mismo Waymouth y Saldaña, pero ni conoció los términos ni dió instrucciones ni recomendó Letrados, contestando solo á Finlay y á Waymouth que la mayor parte de sus negocios se los dejaba á Texidor por acuerdo de las partes.

16.—Resultando: que además de ese testigo declararon en el juicio oral por el demandado dos testigos que manifestaron que la administración de la Hacienda "Carmen" le preocupaba por una hipoteca que pesaba de doscientos mil pesos, que con tal motivo le dijo á uno de esos testigos que deseaba arrendarla á la sociedad demandada, y el otro que Finlay le refirió el arrendamiento mos-

trándole su conformidad, y con tal motivo trajo el testigo la carta con esa conformidad al arrendamiento y que no le preocupaba el divorcio por la cuestión de bienes si porque mortificaba á su dignidad; otro testigo reconoce los documentos por él firmados, Manuel García Marrero; declarando los peritos calígrafos ratificándose en el dictamen presentado, declarando auténticas las firmas de Don Jorge I. Finlay constantes en autos referentes á las cartas dirigidas por él desde Nueva York á Don Hilario Cuevillas y á Mr. Waymouth cotejadas con la indúbita de Don Jorge, obrante en el protocolo del Notario Don Gabriel Guerra y en el testamento ológrafo que otorgó en once de Abril de mil ochocientos noventa y seis ante Don Maurico Guerra en diez y nueve de Enero de mil novecientos tres.

17.—Resultando: que terminadas las pruebas informaron los defensores de las partes lo que estimaron conveniente á sus respectivos derechos.

Siendo Ponente el Juez Presidente Don Juan Morera Martínez.

1.—Considerando: que el arrendamiento es un contrato bilateral consensual en el que una persona se obliga á dar á otra el uso de una cosa por tiempo determinado ó indeterminado, (según los arts. 1480 y 1484 del Código Civil) y precio cierto, contrato que no es posible confundir con el de sociedad, porque en este dos ó más personas se obligan á poner en común dinero, bienes ó industria, con ánimo de partir entre sí las ganancias, elementos que faltan en el contrato objeto del debate, faltando además la entidad nueva ó independiente de la de los socios que requiere toda sociedad constituída por el contrato para que la ley le reconozca esa personalidad según los preceptos del título segundo, libro primero del Código Civil, y en especial los artículos 33 al 37 de dicho Código.

2.—Considerando: que no existe confusión del contrato de arrendamiento con el de sociedad como la demandante afirma, dadas las cláusulas sexta á la catorce del contrato que se impugna, las que no caben ni se comprenden en el de sociedad, Vistos los artículos mil quinientos ochenta y tres, mil quinientos ochenta y ocho, mil quinientos ochenta y nueve, mil quinientos noventa y tres y varios más del Código Civil por recaer las citadas cláusulas del contrato impugnado sobre extremos propios exclusivamente del contrato de arrendamiento, como son los derechos, deberes y obligaciones del arrendatario, á quien incumbe según esas cláusulas la refacción de las fincas su conservación y explotación, la facultad de subarrendar

la obligación de devolver las fincas al término del arriendo en el mismo estado que las recibe, el cumplimiento de los contratos por los aparceros, el pago de las contribuciones, el derecho á cobrar las mejoras existentes á la terminación del contrato y el de que las reparaciones de las máquinas y edificios fueran de cuenta exclusiva del arrendador y descontadas de lo que debía recibir como precio del arriendo, aclarando más y más esa inteligencia del contrato, el convenio de poder pedir el arrendatario la rescisión del mismo (si durante el término de duración ocurriese algún caso fortuito transcendental que impidiese la explotación en los términos ordinarios que ahora se hace) y también el pacto de que el arrendador ó sus herederos pagasen el crédito que principalmente ha motivado esa escritura de arrendamiento pero obligándose el arrendador á pagar la refacción hasta entonces hecha y un beneficio igual al tenido al año anterior.

3.—Considerando: que si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de las cláusulas debiendo interpretarse las unas por las otras atribuyendo á las dudosas el sentido que resulte del conjunto de ellas; y por lo antes expuesto se deduce lo sentado anteriormente de ser la constitución de un arrendamiento la intención evidente de los contratantes y esa intención debe prevalecer en todo contrato.

4.—Considerando: que en el contrato el tiempo es determinado y el precio cierto, fijando aquél la cláusula quinta en diez años de duración y éste la segunda, tercera y cuarta, consistiendo durante el primer año en la suma de veinte y ocho mil ciento ochenta y dos pesos de capital é intereses del crédito hipotecario que se deberían pagar en mil novecientos tres, siguiendo poco más ó menos dicha suma por años en lo sucesivo hasta extinguir los doscientos catorce mil ciento diez pesos del crédito hipotecario que gravaba la finca arrendada, siendo el último plazo pagadero en mil novecientos once, debiendo además de dichos plazos pagar como precio del arriendo al arrendador ó á sus herederos durante todo el término del contrato veinticinco centavos por cada quintal de azúcar de segunda, diez centavos por cada quintal de miel, el cincuenta por ciento de la utilidad líquida del ron elaborado y la mitad líquida que resultare de utilidades en cada año del ganado que el arrendador tenía en la hacienda, cantidades todas que demuestran existente el precio cierto.

5.—Considerando: que no desvirtúa la fijación del término del arriendo lo provisto y convenido en la cláusula 5a. de que si no se lograse pagar el crédito hipotecario dentro de los diez años por causas que no podían determinarse en el momento del otorgamiento pero que podían presentarse sin culpa de la compañía arrendataria se prorrogaría el plazo á lo necesario si el acreedor se prestase á conceder la prórroga fijando plazo para pagar la cantidad insoluta y al arrendatario conviniese la prórroga; porque es natural esa prebisión que en nada perjudica al arrendador ni á sus herederos, dado que éstos pueden pagar la suma pendiente de pago al finalizar los diez años referidos, como pueden pagar en cualquier tiempo que deseen dar por terminado el contrato según consta en la cláusula catorce.

6.—Considerando: que los malos cosechos por la sequía, bajos precios del azúcar, poco rendimiento de las cañas ó enfermedad de la planta y muchas otras causas que pueden hacer no se cubra en los diez años el crédito hipotecario que se adeuda fueron algunos de los motivos que los contratantes tuvieron en cuenta según la cláusula primera para pactar la prórroga, sin que por ello pueda sostenerse que es indeterminada la duración del contrato pues las prórrogas no dejan sin efecto el término fijado, siendo tan solo la consignación del derecho de las partes á llevarlas á efecto si procediere y les conviniere según ha manifestado y dice la cláusula quinta y su concordante la catorce, debiendo por lo tanto ser objeto de nueva estipulación al vencer los diez años fijados como término del arrendamiento.

7.—Considerando: á mayor abundamiento en lo que á la certeza del precio y fijación del término se refiere, que la indeterminación del tiempo no es motivo de nulidad del arrendamiento como lo demuestran los artículos mil cuatrocientos ochenta y mil cuatrocientos ochenta y cuatro al fijar el término legal en defecto de pacto, y en cuanto á la certeza del precio que una cosa es la determinación ó condición incierta del precio y otra la expresión numérica del mismo pudiendo existir precio cierto en el contrato, como existe en el caso de autos, siquiera no pueda expresarse numéricamente sino mediante las liquidaciones correspondientes y esté sujeto á fluctuaciones según el producido de las cañas y del ganado, de conformidad con la teoría establecida en los artículos mil trescientos cincuenta y mil trescientos cincuenta y uno del Código Civil aplicables á los arrendamientos.

8.—Considerando: que para el que ha de contratar con el apoderado así como para los funcionarios públicos que en uno ú otro concepto tiene que apreciar la validez y eficacia de los contratos realizados por mandatarios, los términos literales del mandato son la primera fuente á que se debe acudir para juzgar de los límites de los mismos siendo empero lícito é imprescindible invocar la evidente intención del mandante cuando las palabras de la escritura apareciesen á ella contraria.

9.—Considerando: que la palabra del poder para que en nombre y representación del otorgante y con arreglo á las instrucciones que por separado le comunique lo ejerza'', indica que siendo privadas ó particulares entre mandante y mandatario tales instrucciones solo para ellos serían obligatorias, sin que los efectos de esta limitación puedan ser trascendentales á un tercero ni causarle perjuicio, según jurisprudencia constante del Tribunal Supremo, entre otras, las sentencias de diez y ocho de Noviembre de mil ochocientos sesenta y cuatro y veinte de Julio de mil ochocientos noventa y cuatro.

10.—Considerando: en cuanto á la alegación que se hace para impugnar la ratificación que al contrato de arrendamiento discutido dió Don Jorge Finlay de que éste desconocía los términos del contrato para ratificarlo por carta dirigida al apoderado toda vez que en la misma carta de ratificación expresa que no podía leer ni escribir y por tanto ni pudo comunicar instrucciones escritas á su apoderado ni pudo leer el contrato después de otorgado para ratificarlo, que tal alegación no es atendible no tan solo por que las instrucciones escritas pudieran ser dadas por el poderdante al apoderado en época que podía escribir y pudo también haber leído el contrato antes de estar imposibilitado para leer sino también, porque la imposibilidad para leer y escribir no arguye impedimento para hacer que las instrucciones fueren escritas por otro y firmadas por el poderdante (como lo fué la carta en que expresan la imposibilidad de escribir), ó el contrato leído por otra persona ratificado por el poderdante después de enterado de su contrato.

11.—Considerando: que el convenio celebrado por el apoderado obliga al poderdante y es cuestión baldía en pleito que sobre él se promueva si aquél se excedió ó nó de las facultades que le daba el poder cuando de este no aparece limitación de facultades y aún

en la hipótesis contraria, queda obligado el segundo desde el momento en que clara y evidentemente aparece tuvo conocimiento del contrato por su mandatario celebrado y lo dió por válido aprovechándose del mismo en lo favorable.

12.—Considerando: que constando en el encabezamiento de la escritura de arrendamiento que Don Rafael Ojeda compareció como uno de los Directores de la sociedad demandada constituída en veinte y tres de Mayo de mil novecientos uno, ante el Notario que otorgó el contrato agregando los nombres y apellidos de los socios que la componen, entre ellos Ojeda y que cualquiera de los socios estaba autorizado para llevar la firma social insertándose la cláusula once, que así lo expresa, poco importa firmara Don Rafael Ojeda con su nombre y apellido y no con el nombre colectivo, tanto más si se tiene en cuenta el hecho de haber utilizado la sociedad esa escritura sin impugnarla, sosteniendo por el contrario su validez en estos autos, y el de aparecer dicho Ojeda posteriormente firmando el inventario de la finca arrendada, convenido en dicha escritura, á nombre de la sociedad demandada y no en el suyo pripio.

13.—Considerando: que por el arrendamiento según la escritura aparece, se obligaron recíprocamente arrendador y arrendatario dando uno y ofreciendo dar el otro lo que en dicho contrato la Ley previene; y como en el mismo y cláusula segunda se dice que uno de los motivos del otorgamiento es el pago del crédito hipotecario ascendente á doscientos catorce mil ciento diez pesos, y en el hecho segundo de la mencionada escritura, que el contrato obedece también al estado de salud del arrendador que deja mucho que desear obligándole á permanecer fuera de la Isla y de la dirección personal de sus negocios y de las fincas arrendadas, corroborando esta manifestación el fallecimiento del arrendador ocurrido en veinte y cuatro de Diciembre de mil novecientos dos á los dos meses de otorgado y el dicho de los testigos Sres. Saldaña y Crosas no puede sentarse dadas esa constancia y lo que la prueba en conjunto arroja, que no existe ni existió motivo ó causa para el contrato y menos aunque ésta fuera ilícita, torpe ó falsa.

14.—Considerando: que si la causa no se expresa en el contrato se presume que existe y que es lícita mientras no se pruebe lo contrario; sin que el testamento otorgado en mil ochocientos noventa y seis demuestre ni pueda demostrar incompatibilidad con el arren-

damiento ni que existieran otras causas por no aparecer del resultado de la prueba en conjunto.

15.—Considerando que carece de fuerza la alegación de que el contrato impugnado reconoció como única causa el deseo de Don Jorge I. Finlay de evadir los efectos de la demanda de divorcio interpuesta contra él por su consorte, ya que anotada en el Registro de la Propiedad dicha demanda sobre los bienes inmuebles de Don Jorge I. Finlay, todos los actos de éste relativos á dichos inmuebles habrían de subordinarse á las consecuencias del fallo que en la demanda de divorcio anotada se dictara y por lo tanto no es de presumir que el contrato referido debiera su origen al propósito de eludir los efectos de la liquidación de gananciales, propósito que en modo alguno podía conseguirse mediante el otorgamiento de un contrato con una causa ilícita ó sin causa, sin que por otra parte la anotación de la demanda impidiera al demandado realizar ningún acto de enagenación de sus bienes anotados.

16.—Considerando: que en el supuesto de que el contrato cuestionado tuviera una causa torpe, de acuerdo con el principio que regula la materia, de nulidad de contratos consignado en el artículo mil doscientos sesenta y nueve del Código Civil no podría ejercitarse la acción de nulidad por Don Jorge I. Finlay que habría sido el causante de ella, arrendando en condiciones onerosas su hacienda Carmen para evitar los efectos de un pleito seguido contra él ni tampoco por su heredera continuadora de su personalidad, cuyo derecho á la finca arrendada procede únicamente de habérselo transmitido el causante de la nulidad que alega en este juicio.

17.—Considerando: que las manifestaciones contenidas en un testamento como acto unilateral que es, solo perjudican al testador y á sus herederos de acuerdo con los principios que regulan la fuerza probatoria de los documentos públicos consignados en el artículo mil ciento ochenta y seis del Código Civil por consiguiente no es lícito invocar las manifestaciones consignadas por Don Jorge I. Finlay y su testamento otorgado en once de Abril de mil ochocientos noventa y seis para desvirtuar las hechas años después en un contrato reducido á escritura pública.

18.—Considerando: que las partes cuyas pretensiones se desestimen en absoluto deben ser condenadas en costas.

FALLAMOS: que debemos declarar y declaramos sin lugar la demanda promovida por Da. Josefina Finlay de Fabián contra Finlay Brothers and Waymouth Trading Company y en su virtud absolvemos de ella á la sociedad demandada con las costas á la demandante. Así por ésta nuestra sentencia lo pronunciamos, mandamos y firmamos.—Juan Morera Martínez. José Tous Soto. Con voto concurrente, Frank H. Richmond.

El voto del Juez Sr. Richmond, dice así:

"OPINIÓN DEL JUEZ ASOCIADO SR. FRANK H. RICHMOND.

Sin haber examinado los autos en el detalle que hubiera sido necesario si al redactar la sentencia hubiera tocado al que suscribe, concurro en desestimar la demanda interpuesta. La demanda ha sido interpuesta á mi consideración bajo dos bases distintas dentro de la misma cuestión en el fondo.—¿El arrendamiento de la Hacienda "Carmen" otorgado por Don Juan Finlay como apoderado de su hermano Jorge, su dueño, á la compañía de la que ambos hermanos, Juan y Jorge, eran accionistas, era tan ventajosa para el apoderado y perjudicial á los intereses de su poderdante y de los herederos de éste, quienes habrían en corto plazo después de dicho otorgamiento sustituirle, que pudiera calificarse como fraudulento en el sentido jurídico en lo que respecta á aquellos herederos y requiere para su validez legal la ratificación por dicho poderdante en forma implícita la que no consta en los autos? No creo que en vista de un fraude jurídico claramente establecido, la expresión de satisfacción general con el arreglo llevado á efecto según aparece de las cartas del difunto Jorge Finlay y las conversaciones de éste con los testigos Saldaña, Crosas y Cuevillas, faltas como están como pruebas inherentes de que el difunto estaba en completo conocimiento de los detalles de dicho contrato de arrendamiento, sean suficientes para establecer la ratificación expresa. A pesar de que es cierto de que esta fase del caso no ha sido presentada nada más que lijeramente por el abogado del demandante es en mi mente la única de la cual pudiera depender el buen resultado de dicha demanda por sus méritos y no encuentro hecho de tal naturaleza en el contrato de arriendo otorgado por el apoderado que pudieran dar á éste una ventaja tan grande contra los

intereses de su ausente poderdante que justificaran la conclusión de que el contrato de arrendamiento era tanto legal como literalmente fraudulento. Mientras más minuciosamente examina uno el contrato de arrendamiento más grande crece la convicción de que está lejos de estar en conflicto con el testamento ejecutado en años anteriores y de ser una revocación de aquél dentro de cierto límite, es un proyecto cuidadosamente estudiado para garantizar la ejecución de lo pensado por el testador tal como lo expresa su testamento. Una inmensa plantación de azúcar con la necesaria maquinaria de muy difícil administración y operación, es testada á tres mujeres herederas, el testador provee que la finca debe ser primero dejada libre de todo gravámen, que no habrá de gravarse nuevamente dicha finca y que será para el absoluto goce y beneficio de aquellas herederas, con ese fin el disfrute y goce absoluto de la propiedad se suspende hasta que la hipoteca sea pagada y las sumas de las rentas que podrán gozar al presente queda limitada á trescientos pesos al mes cada una. Se provee también contra la no pensada enagenación de la finca (bien que esto puede ser inefectivo por falta de todos los requisitos técnicos de un fideicomiso testamentario) por medio de una cláusula al efecto de que si fuere necesario vender la propiedad, lo que produjese dicha venta será invertido en fondos ingleses ó depositado en el Banco de Inglaterra.—En vista de la intención palpable en el mismo testamento no puedo encontrar que dicho contrato de arrendamiento, ejecutado por el apoderado, resulte en manera alguna que para el mejor cumplimiento y ejecución de la intención del testador. Las alegaciones y la prueba no dejan en mi mente la más pequeña sospecha de que el arrendamiento era un propósito que traería por consecuencia el que el apoderado se enriqueciese personalmente con perjuicio de los herederos.—Jorge Finlay poseía cuatrocientas acciones en la compañía arrendataria de cuyas acciones doscientas sesenta y una pasaron después de su muerte á dos de sus herederos y cincuenta y cinco á un legatario que está en relaciones de amistad con ellos y las restantes (ya fueren ochenta y cuatro ó fueren cien lo que no aparece muy claro de autos) son retenidas en condominio por los dos albaceas ó fideicomisarios para destinarla á fines en conexión con su cargo. La demandante voluntariamente ha aceptado una distribución de los bienes del testador pero la cual ninguna de dichas acciones viene á poder de ésta. El esposo de una de las herederas es tenedor de acciones en su propio nombre pero los autos no indican la cuantía ni tampoco que intereses proporcionales ó dominio tiene Juan Finlay

en la susodicha compañía. Sin embargo, cuantos hechos puedo yo deducir de los autos sirven para convencerme de que si el arriendo pudiera resultar beneficioso á Juan Finlay como accionista de la compañía arrendataria lo es también, al mismo tiempo, por el mismo instrumento y en mayor proporción, ventajoso y lucrativo á aquellos de los herederos que voluntariamente no renunciaron su participación como tenedores de acciones en sus rendimientos. El demandante alega que en el año mil novecientos cuatro las ganancias que resultaron á favor de la compañía arrendataria, después de pagar la cantidad anual y los intereses sobre la hipoteca, serán de cuatrocientos siete mil ochenta y seis pesos, que en el décimo año de dicho plazo las ganancias serán, sin pagar cantidad alguna sobre la hipoteca, setenta mil pesos la hoja de balance de la compañía correspondiente al año de mil novecientos dos demuestra una ganancia de quinientos veinte y nueve mil pesos setenta y ocho centavos sobre todas las operaciones hechas durante el año en conexión con la hacienda Carmen. En aquel año se produjeron cincuenta y siete mil quinientos veinte quintales de azúcar que obtuvieron un valor de ciento ochenta y cuatro mil quinientos cuarenta y un pesos en lugar de seis mil novecientos quintales con un valor de doscientos veinte y ocho mil novecientos pesos como calcula la demandante. Los herederos reciben ganancias por igual de los rendimientos de la ganadería de la compañía arrendataria, y este elemento puede ser desechado al tratar de buscar indicios que indiquen la existencia de fraude alguno. No estoy seguro de si estas hojas de balance incluyen interés ó cantidad anual alguna pagada sobre la hipoteca, pero con toda seguridad no puede incluir una suma mayor de quince mil pesos pagados á los herederos de acuerdo con lo convenido en las cláusulas de contrato de arrendamiento á razón de veinte y cinco centavos quintal por el azúcar producida y diez centavos sobre cada galón de ron. Si veinte y siete mil pesos más de gravámen por concepto de la hipoteca han de ser pagados de las ganancias, la ventaja neta de la compañía arrendataria desaparece, y analizando la hoja de balance no puede creer que la producción de azúcar dé un rendimiento mucho mayor de la suma de cuarenta mil pesos. No existe ningún otro punto que sostenga esta faz del caso en la prueba presentada por la demandante, excepto la prueba pericial con respecto á la capacidad de la hacienda Carmen para producir azúcar y esa prueba no modifica la que creo sea una conclusión prudente de tales hechos tal como he podido apreciarlo, dejando á un lado el riesgo y las dificultades á que está sujeta la

industria mencionada, la necesidad de emplear la suma de cien mil pesos de capital con que explotar dicho negocio anualmente, suma que tiene que ser proporcionada por la compañía arrendataria sin ayuda de ninguna clase por parte de la demandante; y principalmente en vista del alto grado de pericia necesaria para el buen éxito administrativo de una plantación de azúcar y también la escasez de administradores competentes, ese arriendo no puede considerarse irrazonable que traiga como resultado al tenedor de una cuarta parte de las acciones de la compañía arrendataria por sus trabajos en la administración general de la finca de cien mil pesos anuales como su parte de ganancias en lugar de un beneficio de dos mil quinientos pesos que aparecen más probable que lo que aparece de los autos. De consiguiente la conclusión de que el apoderado ejecutó un contrato de arrendamiento para enriquecerse personalmente y con detrimento de los intereses de los herederos no puede encontrar fundamento en la prueba presentada. 2.—¿La cláusula de renovación del contrato de arrendamiento está de tal manera redactada que coloca á dicha propiedad fuera del dominio de los herederos por un período de tiempo indefinido y deja á estos últimos opción ó selección ninguna respecto al tiempo que ha de durar dicho arrendamiento? El contrato de arrendamiento también se encuentra falto en lo que respecta á la forma en que va redactado puesto que no tiene cláusula en caso de no cumplimiento por dejar de cumplir lo que respecta á la entrega de la cantidad que perciben los dueños en vez de alquiler. Si este fuera el efecto y construcción de la cláusula catorce del contrato de arrendamiento la ventaja que este apoderado obtendría arrendando la propiedad á una corporación de la que él era accionista, posponiendo indefinidamente la entrada á los herederos en el completo goce de sus respectivos derechos como tales, vendría á ser de ningún valor dicho arrendamiento por fraude constructivo á menos que el poderdante lo hubiese ratificado con la solemnidad y formalidad que necesitó y se ejecutó el testamento por el cual el poderdante otorgó la propiedad á sus hijas sujetas solamente al pago de gravamen hipotecario. En estos dos particulares este contrato de arrendamiento no ha sido estimado con la extensión debida que caracteriza el trabajo de los Notarios en Puerto Rico, pero escasamente puede concebirse que esa compañía arrendataria pudiera ser sostenida en la posesión de la propiedad después de una falta voluntaria por parte de la misma á la entrega de las sumas estipuladas ni tampoco que prórroga alguna del tiempo del arrendamiento á la terminación

del presente contrato puede ser efectiva sin que los herederos accedan á ello. No puede imaginarse qué adherencia estricta á la letra del contrato de arrendamiento ó tal prevención de la justicia en la interpretación y aplicación del Código Civil y del artículo que provee la rescisión de un contrato por falta de cumplimiento de las condiciones estipuladas en el mismo pudiera encontrarse en los Tribunales de Puerto Rico que trajeran consigo una dilación prolongada en la toma de posesión de los herederos de aquello que les pertenece. He presentado mi opinión en esa forma por que no esoy seguro de que el caso tal como ha sido desarrollado por los argumentos de la demandante, tal como ha sido oído y como ha sido fallado descansa en los méritos de las cuestiones que han de ser estudiadas en el asunto y ha faltado tiempo para realizar el trabajo necesario para escojer y coordinar un artículo del Código Civil con otro al extremo de que las consideraciones por mí expuestas sean expresadas en la forma que expone el Código Civil y se hagan las correspondientes citas de los artículos que en aquél justifican las diferentes fases que yo sostengo de la cuestión y que pueden concretamente expresarse así: La autorización general contenida en el poder no autoriza al agente á enriquecerse á costa de su representado. 2. Cuando un contrato ejecutado por un apoderado á nombre de su representado tiene la posible expectación de enriquecerse aquél á costas de éste último necesita esencialmente para su validez una expresa y explícita autorización para hacer ese contrato ó de una confirmación del mismo que en sí viene á equivaler á una ratificación expresa y explícita y una parte que otorga un contrato de esta índole con apoderado lo hace á su peligro propio. "3. Un contrato así hecho y que tiene dentro de su alcance y efecto el enriquecerse el agente y en su consecuencia constructivamente fraudulento puede resolverse en la ausencia de una autorización expresa ó una ratificación expresa porque la autorización original para hacer el contrato no existe y siendo nulo puede ser echado á un lado en la demanda del principal ó de aquellos que queden en su puesto. Un espíritu inquisitivo con respecto á si tal contrato era la cuestión base del pleito ha guiado mi estudio del caso, y no encontrando tal elemento presente, concurro en el fallo y en los razonamientos en que está basado.—Frank H. Richmond.

*Resultando* que contra esta sentencia la representación de la parte demandante interpuso recurso de apelación que le fué admitido, y elevados los autos á este Tribunal se personaron las partes en su oportunidad.

*Resultando* que la representación de la parte apelante en su alegato escrito y oralmente en el acto de la vista reprodujo todas las mismas razones que alegó en su demanda y que constan consignadas y rebatidas en la sentencia que es objeto de la apelación.

*Resultando* que la representación de la parte apelada asimismo repitió en iguales trámites los argumentos legales de su contestación y que igualmente constan discutidos en el fallo de que se ha hecho mérito.

*Visto,* siendo Ponente el Juez Asociado Don José Ma. Figueras.

Aceptando los fundamentos de hecho y de derecho de la sentencia recurrida ménos el décimo sexto de esta clase, y en su lugar,

16.—*Considerando* que el verdadero punto importante en este litigio y sobre el que principalmente descansa y confía la pretensión de nulidad, es la suposición de que el contrato de arrendamiento se simuló por Don Jorge I Finlay para prevenir los efectos que sobre los bienes gananciales pudieran derivarse de la demanda de divorcio establecida por su esposa Da. Emilia Van Rhyn; pero no hay prueba alguna que de modo directo traiga al animo el convencimiento de que el contrato presidió ese propósito y no cabe poner simples conjeturas en frente de la escritura pública de 24 de Octubre de 1902 otorgada con todas las solemnidades y condiciones de la ley, cuya falsedad ó nulidad no se ha justificado y en la que se consigna la causa legítima de dicho contrato de arrendamiento que fué ratificado por el contratante Don Jorge I. Finlay, según cartas dirigidas por éste á Don Hilario Cuevillas y á Don Jorge Waymouth en 7 de Noviembre de 1902, por cuyas razones no es necesario considerar si puede ó no la heredera y apelante Da.

Josefina Finlay de Fabián ejercitar la acción de nulidad de dicho contrato.

19.—*Considerando* que las costas del recurso deben imponerse á la parte apelante.

Vistas las disposiciones citadas en el fallo apelado.

*Fallamos* que debemos confirmar y confirmamos la sentencia que en dos de Junio de 1904 dictó la Corte de Distrito de San Juan declarando sin lugar y con costas, la demanda promovida por Da. Josefina Finlay de Fabián contra Finlay, Brothers and Waymouth Trading Co., é imponemos las costas del recurso á la parte apelante; comuníquese á dicha Corte con copia de esta resolución para los efectos procedentes.

Así por esta nuestra sentencia, lo pronunciamos, mandamos y firmamos.

Jueces concurrentes: Sres Presidente Quiñones y Asociados Hernández y MacLeary.

El Juez Asociado Sr. Wolf no formó Tribunal en la vista de este caso.